NEW JERSEY PROTECTION AND ADVOCACY, INC.
BY: WILLIAM EMMETT DWYER, ESQ.
   210 SOUTH BROAD STREET, 3RD FLOOR
TRENTON, NEW JERSEY 08608
(609) 292-9742
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

NEW JERSEY PROTECTION & ADVOCACY, INC.; ALLISON HARMON, by and through her guardians, Valerie Harmon and Linda Lemore, and FREDRENA THOMPSON

        Plaintiffs,

v.

JAMES M. DAVY, in his official capacity as Commissioner of Human Services for the State of New Jersey,

        Defendant.

Docket No

Complaint for Declaratory And Injunctive Relief

## PRELIMINARY STATEMENT

Thousands of New Jersey citizens with developmental disabilities are forced to live in large institutions unlawfully segregated and isolated from family and friends because Defendant has failed to provide community-based housing, programs, and services for them. Defendant has not only failed to develop and provide such community-based programs and services, but also to develop and administer an adequate assessment tool for identifying those individuals who are appropriate for living in settings other than developmental centers. Many residents now living in developmental centers want to and could live in the community with appropriate supports and

services, and they could do so without the Defendant undergoing a fundamental alteration in the way he administers his programs, services, and activities.

Defendant has long failed to comply with the mandates and requirements of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act (Section 504), and Title XIX of the Social Security Act (Medicaid), which call for a comprehensive integration plan that at a bare minimum, identifies residents' eligibility for discharge, specifies time frames for resident discharge, and describes the collaboration that will take place between the Defendant and others to ensure that programs and services are in place to accomplish successful, safe community integration for those wishing to live in the community. The failure to develop a comprehensive integration plan and an adequate assessment tool has sentenced thousands of individuals with developmental disabilities to unnecessary, illegal segregation in institutional settings such as developmental centers.

## JURISDICTION AND VENUE

1. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Plaintiffs' claims are authorized by 42 U.S.C. §§ 1983 and 12132, and 29 U.S.C. § 794a.

3. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391.

4. Declaratory relief is authorized under 28 U.S.C. § 2201; injunctive relief is authorized by 28 U.S.C. § 2202. Defendant's actions have resulted in irreparable injury to Plaintiffs, for which they have no adequate remedy at law.

Plaintiffs

### New Jersey Protection & Advocacy

5.  New Jersey Protection & Advocacy, Inc. (NJP&A), a non-profit corporation, is the federally funded agency designated since 1994 to serve as New Jersey's protection and advocacy system for people with disabilities. Pursuant to this designation, NJP&A serves as the agency to implement, on behalf of the State of New Jersey, the Protection and Advocacy System for the Developmentally Disabled established pursuant to the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 *et seq.*

6.  NJP&A is part of a nationwide network of protection and advocacy agencies located in all fifty states, the District of Columbia, Puerto Rico, and the federal territories. The protection and advocacy system comprises the nation's largest provider of legally-based advocacy services for people with disabilities.

7.  By virtue of its designation, NJP&A has statutory authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of individuals with developmental disabilities who are or will be receiving care and treatment in New Jersey. 42 U.S.C. § 15043(a)(2)(A)(i).

8.  NJP&A is pursuing this action to protect and advocate for the rights and interests of "individuals with developmental disabilities" as that term is defined in 42 U.S.C. § 15002. Specifically, NJP&A brings this action on behalf of individuals who are unnecessarily institutionalized in the State's seven large, congregate facilities (known as developmental centers) and who wish to reside in more integrated settings in the community.

3

allow them to bring suit in their own right against Defendant.

Allison Harmon

10.    Allison Harmon, age 37, is a resident of Vineland Developmental Center in Vineland, New Jersey.

11.    Allison has a diagnosis of mental retardation, cerebral palsy with quadriplegia, and mental illness. She experienced brain damage at birth and has severe dysphagia (inability to swallow). She receives nutrition by means of a feeding (PEG) tube. She uses a wheelchair for mobility.

12.    Allison has been a resident of Vineland Developmental Center since 1996. She is eligible for Medicaid services.

13.    Allison makes decisions with the assistance of her two sisters, who serve as her co-guardians. The guardianship is limited to legal and medical issues.

14.    The professionals at Vineland Developmental Center, who work with Allison, as well as Alison and her sisters, agree that Allison is capable of living in the community rather than an institution if appropriate supports are provided.

15.    All of the individuals in the above paragraph agree that the least restrictive environment appropriate for Allison is a barrier-free community living environment with 24-hour staff.

16.    Allison fervently wishes to reside in the community, rather than in an institution.

17. Allison feels isolated, lonely, and frustrated at Vineland Developmental Center. She is alert and oriented, and her cognitive abilities exceed most of her fellow residents. She communicates using assistive technology, gestures, and other sounds.

18. Aside from the staff at Vineland, there are few individuals at Vineland with whom Allison feels she can have meaningful interactions. When staff members go on vacation, Allison feels even lonelier.

19. Allison's sisters are very concerned about her boredom and frustration. They are displeased that, in order to pass the hours, Allison must resort to repeatedly wheeling herself up and down the hallways of the institution in her wheelchair.

20. Allison enjoys attending church services in the community and has expressed a desire to leave Vineland at night and on weekends. However, there are limited opportunities for her to do so.

21. Allison's sisters invite her to visit their homes on as many weekends as possible. While she is visiting her sisters, Allison enjoys attending church, going to plays, going to the movies, visiting the beach, assisting with laundry, traveling and shopping. Allison has even accompanied her family to Disneyworld on vacation.

22. Because Allison needs 24-hour assistance, Allison's sisters are unable to have Allison with them every weekend. On weekends when Allison's sisters have other obligations, they feel extremely guilty because they know Allison is bored and lonely. Opportunities for Allison to leave the Developmental Center (other than with her family) are infrequent.

23. With appropriate supports and services, Allison could have a small group living in the community. There, she could interact with a broader range of individuals, both those with disabilities and those without.

24. Defendants continue to offer Allison services only in a segregated, institutional setting.

Fredrena Thompson

25. Plaintiff, Fredrena Thompson has been a resident of North Jersey Developmental Center for five years. She is eligible for Medicaid services.

26. Fredrena Thompson was born on May 6, 1970 in Newark, New Jersey. She is 35 years old and is diagnosed with moderate mental retardation, seizure disorder, hypertension, and schizoaffective disorder.

27. Fredrena was classified as mentally retarded and educable at nine years of age. At age 18, she was labeled mentally disturbed and has had numerous psychiatric hospitalizations.

28. The professionals at North Jersey Developmental Center are confident that, with support, Fredrena could live in the community rather than in an institutional setting.

29. Fredrena is fully capable of and wants to live in the community. She values and wants interaction with the community at large.

30. Fredrena wants to do her own shopping, as well as go to movies and restaurants if she chooses. She feels extremely depressed because she is not living her life to its fullest potential in the developmental center, and her desire to live in the community is being ignored.

31. Defendant continues to offer medical services only in a segregated, institutional environment.

### Defendant

32. Defendant, James M. Davy is Commissioner of the Department of Human Services of New Jersey (DHS), a public entity covered by *inter alia*, Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 (1).

33. Defendant Davy is ultimately responsible for ensuring that New Jersey operates its delivery of services to individuals with disabilities in conformity with the Constitution of the United States, with the ADA and its implementing regulations, and with section 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794a, and its implementing regulations.

34. DHS is responsible for the operation of New Jersey's seven developmental centers.

35. DHS is authorized to administer New Jersey's Medicaid program.

36. Defendant Davy is responsible for the establishment and maintenance of the state plan for Medicaid services in compliance with federal law and regulations.

### GOVERNING STATUTES

**A.     The Anti-Discrimination Laws: The Americans with Disabilities Act and Section 504 of The Rehabilitation Act**

37. On July 26, 1990, the Americans with Disabilities Act was enacted, establishing the most important civil rights law for persons with disabilities in our nation's history.

provisions. 42 U.S.C. §§ 12131-12134.

39. Title II of the ADA prohibits public entities such as Defendant from discriminating against the individuals with disabilities whom they serve. 42 U.S.C. § 12131-32.

40. Discrimination under the ADA includes the segregation of persons with disabilities from society as a result of unnecessary institutionalization. *Olmstead v. LC,* 527 U.S. 581 (1999).

41. The regulations promulgated under Title II specifically provide that a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d). The regulations prohibit the Defendant from administering programs in a discriminatory manner. 28 C.F.R. § 35.130(b)(3)(i)-(ii).

42. The regulations also prohibit discrimination caused by providing different or separate services to individuals based on the severity of their disability, unless necessary for the services to be effective. 28 C.F.R. § 35.130(b)(1)(iv).

43. Furthermore the section of Title II of the ADA entitled, "Enforcement," 42 U.S.C. § 12133, explicitly states that the "remedies, procedures, and rights set forth in section 794a of [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides." 42 U.S.C. § 12133. Section 504 of the Rehabilitation Act sets forth protections against discrimination by recipients of federal funds and also includes an integration mandate

prohibiting unnecessary segregation. 29 U.S.C. § 794(a); 45 C.F.R. §§ 84.4 and 28 C.F.R. § 41.51.

## B. The Medicaid Act

44. The Medicaid program, established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., is a cooperative federal-state program designed to enable the states to furnish medical assistance to families and individuals who are unable to meet the costs of necessary medical services.

45. States are not obligated to participate in the Medicaid program. However, if a state elects to participate, it must operate its program in compliance with federal statutory and regulatory requirements.

46. States that choose to participate in the Medicaid program receive federal matching funds for their Medicaid program. To receive federal funds, states must comply with the requirements of the federal Medicaid Act and with the federal regulations governing state Medicaid programs promulgated by the Center for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services, the agency that administers Medicaid at the federal level.

47. Each state participating in the Medicaid Program must receive approval for its plan for providing services. States must include certain mandatory services. 42 U.S.C. § 1396a(a)(10)(A). Mandatory services include, among other things, inpatient hospital services, physician's services, and nursing facility services. 42 U.S.C. § 1396a(a)(10)(A) and 1396d(a).

In addition to mandatory services, a state may also provide optional services. 42 U.S.C. § 1396d(a). Optional services include funding for intermediate care facilities for the mentally retarded (ICF/MR). 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(15).

49. In addition to the mandatory and optional services described above, a state may request approval from CMS to "waive" certain Medicaid Act requirements to obtain Medicaid funding for programs providing home and community-based services as an alternative to long-term institutionalization. This program is known as the Medicaid Home and Community Based Waiver program ("the waiver program" or "the waiver"). 42 U.S.C § 1396n(c).

50. Under the waiver program, if a state meets certain criteria, Medicaid requirements as statewideness, 42 U.S.C. § 1396a(a)(1), and comparability of services, 42 U.S.C. § 1396a(a)(10)(B), may be waived to permit the state to provide a specific number of individuals within a defined disability group with services that permit those individuals a community alternative to long-term institutional care.

51. Once a state has an approved Medicaid waiver, the state is bound in the provision of waiver services by federal statutory and regulatory mandates of the Medicaid program, except for those limited requirements waived during the approval of the waiver plan.

52. New Jersey participates in the Medicaid program.

53. The New Jersey Medicaid program is administered by Defendant.

54. Among the optional Medicaid services Defendant provides are ICF/MR services. These services are provided in institutions known in New Jersey as "developmental centers."

55. In addition to mandatory and optional services, Defendant has received CMS's approval to operate a Home and Community Based Services Waiver program for individuals with developmental disabilities. This allows Defendant to provide home and community-based services to a federally-approved maximum number of participants who require an ICF/MR level of care and who have applied for and received a waiver slot.

56. Medicaid regulations require Defendant to determine whether it is necessary for Medicaid beneficiaries to remain in institutions, 42 C.F.R. § 456.609(b), and to determine the feasibility of alternative, non-institutional services, 42 C.F.R. § 456.609(c).

57. States must offer Medicaid services to eligible individuals with "reasonable promptness" and must give those interested in applying the opportunity to do so. 42 U.S.C. § 1396a(a)(8).

58. Persons with disabilities who live in or are at risk of being placed in an institution must be informed of and given a meaningful choice of institutional and community alternatives and must be permitted to receive services from any qualified provider. 42 U.S.C. § 1396n(c)(2)(c); 42 C.F.R. §§ 435.217; 441.302(d)(1)-(2); 42 U.S.C. § 1396a(a)(23)(A).

## STATEMENT OF FACTS

59. New Jersey operates seven Intermediate Care Facilities for the Mentally Retarded (ICF/MR's). These seven institutions are: the Green Brook Regional Center, the Hunterdon Developmental Center, the New Lisbon Developmental Center, the Vineland Developmental Center, the Woodbine Developmental Center, the North Jersey Developmental Center, and the Woodbridge Developmental Center.

the individuals residing within these institutions suffer from developmental disabilities such as mental retardation, autism, cerebral palsy, spina bifida, and traumatic brain injuries.

61. The individuals living within these congregate facilities are clients of the Division of Developmental Disabilities (DDD), an agency within DHS.

62. At forty-eighth, New Jersey ranks among the worst states in the nation with respect to the percentage of its general population residing in ICF/MR's.

63. The State has failed to significantly address the level of forced institutionalization in this State.

64. According to the Defendant, the total number of individuals residing at developmental centers in April 2005 was 3,067.

65. Upon information and belief, the actual number of individuals who resided in developmental centers for thirty days or more in April 2005 was higher because Defendant counts numerous individuals who have lived in developmental centers for more than thirty days as "guests" rather than residents.

66. In 2000, the average daily census of residents in the state's developmental centers was 3,556, according to Defendant.

67. In 2002, the average daily census of residents in the State's developmental centers was 3,364, ranking New Jersey 48th among the states in institutional utilization rate for its developmentally disabled population.

upon information and belief, New Jersey's abysmal ranking among the states has not changed significantly since 2002.

69. Individuals continue to be admitted into the developmental centers because of the absence of appropriate services in the community.

70. Many institutionalized individuals with developmental disabilities could and would choose to live in small homes or residential settings in the larger community if adequate and appropriate supports and services were available to them.

71. The New Jersey Legislature has expressly determined that every person receiving treatment through the Division of Developmental Disabilities has a right to receive services in a setting and manner least restrictive of his or her right to personal liberty. N.J.S.A. 30:6D-9.

72. The manner in which the Defendant operates its programs for ICF/MR eligible individuals violates Title II of the Americans with Disabilities Act and its implementing regulations, including the regulation requiring public entities to administer their programs in the most integrated setting appropriate to qualified individuals with disabilities, 28 C.F.R. § 35.130(d).

73. Defendant fails to provide accurate and detailed assessments on a regular basis for all individuals residing in developmental centers to determine whether they could live in less-restrictive settings, and if so, what setting would be appropriate and what supports would be needed.

74. Defendant has no plan and/or an inadequate plan to comply with Title II of the Americans with Disabilities Act, as interpreted by the *Olmstead* Court. Defendant has not

13

as a necessary adjunct to any activity has led to unnecessary institutionalization.

75. Upon information and belief, Defendant has not properly utilized all available Medicaid Home and Community Based waiver slots to comply with the integration mandate of the Americans with Disabilities Act and to end its ongoing discrimination of qualified individuals with developmental disabilities.

76. Defendant does not inform individuals of their right to choose integrated, less-restrictive community supports and/or Home and Community Based waiver services and does not give institutionalized individuals an opportunity to apply for those services. Defendant does not provide opportunities to reside in community settings with reasonable promptness.

77. Plaintiffs' relief is readily achievable if Defendant changes the manner in which it operates its already-existing programs without the creation of new programs.

78. Defendant's policies and practices have resulted in the failure to provide community living opportunities for individuals with disabilities in settings designed to maximize their potential in the least restrictive setting possible.

79. In short, Defendant has taken no steps to demonstrate a commitment to ending unjustified isolation and segregation of qualified individuals with developmental disabilities, as required by federal law.

## FIRST CAUSE OF ACTION

### Violation of the Americans with Disabilities Act

80. Plaintiff incorporates and realleges the allegations contained in Paragraphs 1 through 79 of the Complaint.

81. Institutionalized individuals with developmental disabilities are "qualified individuals with a disability" within the meaning of 42 U.S.C. §12131(2). They have a physical and/or mental impairment, that substantially limits one or more major life activities, including their ability to live independently and without support.

82. Defendant violates the anti-discrimination provision of the ADA, 42 U.S.C. § 12132, by offering only institutional care instead of community-based care to qualified individuals who would choose community-based care and who are appropriate for such care even though the provision of community-based services would not entail a fundamental alteration of the Defendant's programs, services, or activities.

83. Defendant discriminates against qualified individuals with developmental disabilities by failing to properly assess them for community-based services, and by failing to inform them of community living options. Instead, Defendant requires qualified individuals to remain confined in segregated facilities in order to receive the services they need.

84. Defendant does not have a comprehensive, effectively working plan for serving qualified people with developmental disabilities in the most integrated setting appropriate to their needs.

confined in unnecessarily segregated environments, rather than in the community, in violation of Title II of the ADA and its implementing regulations.

## SECOND CAUSE OF ACTION
### Violation of the Rehabilitation Act of 1973

86. Plaintiff incorporates and realleges the allegations of Paragraphs 1 through 85 of the Complaint and of the Paragraphs of the First Cause of Action above.

87. Residents of Developmental Centers are qualified individuals with a disability under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations. They have mental and/or physical disabilities that substantially limit their ability to live independently without adequate supports and services.

88. Defendant has received and continues to receive federal financing assistance, including Medicaid, and is, thereby, a recipient of federal aid within the meaning of 29 U.S.C. § 794(b).

89. Residents of developmental centers who are appropriate for community-based services and who want such services have been discriminated against by Defendant, who has denied them access to such services in violation of Section 504, even though it would not entail a fundamental alteration of the Defendant's program, services, and activities to provide such

90. Defendant's unnecessary segregation of qualified individuals with disabilities constitutes unlawful discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and its implementing regulations.

## THIRD CAUSE OF ACTION
## Violations of Medicaid Act

91. Plaintiff incorporates and realleges the allegations of Paragraphs 1 through 90 of the Complaint and of the Paragraphs of the First and Second Causes of Action above.

92. Defendant oversees and is responsible for administering New Jersey Medicaid, a program of medical aid and services to people in New Jersey, some of whom have developmental disabilities. Medicaid is governed by the Medicaid Act, Title XIX of the Social Security Act.

93. Defendant's administration of the Medicaid program in a manner that denies eligible individuals the opportunity to make application for and receive needed home and community-based services with reasonable promptness violates 42 U.S.C. § 1396a(a)(8).

94. Defendant's administration of the Medicaid program, in a manner that fails to inform individuals of non-institutional waiver alternatives to developmental center residence and fails to offer a meaningful choice between segregated institutional care and appropriately integrated community services, violates 42 U.S.C. § 1396n(c)(2)(c) and 42 U.S.C. 1396a(a)(23)(A).

95. Defendant has, under color of state law, deprived qualified institutionalized individuals with developmental disabilities rights secured to them by the laws of the United States in violation of 42 U.S.C. § 1983.

17

continue to be unnecessarily institutionalized.

## RELIEF REQUESTED

**WHEREFORE**, the Plaintiffs request that the Court:

A.  Declare that Defendant's failure to provide services to qualified individuals with developmental disabilities in the most integrated setting appropriate to their needs violates Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Title XIX of the Social Security Act.

B.  Issue a permanent injunction:

    (i.)    requiring Defendant to inform individuals with developmentally disabilities who are eligible for services from the Division of Developmental Disabilities that they may be eligible for community services, that they have the choice of such services, and that the State will provide such services in accordance with specified reasonable timelines;

    (ii.)    requiring Defendant to promptly determine the eligibility of current and future developmental center residents for community services;

    (iii.)    requiring Defendant to establish a plan with reasonable timelines for moving into the community all current and future residents deemed capable of living in the community with appropriate supports and services who want to live in the community; and requiring that such a plan be a viable integration plan that

18

demonstrates the State's commitment to community placement, addresses the elements to effectuate such a plan, and includes provisions for the Defendant to be held accountable to the Court;

C. Grant such other relief as this Court deems appropriate, including an award of reasonable attorneys' fees, litigation expenses, and costs.

BY: /s/ William Emmett Dwyer
William Emmett Dwyer
Attorney for Plaintiffs
New Jersey Protection and Advocacy, Inc.
210 South Broad, 3rd Floor
Trenton, NJ 08608

DATED: September 29, 2005

### Certification Pursuant to Rule 201.1(d)

William Emmett Dwyer certifies as follows:

The within civil action is based on an alleged violation of a right secured by the Constitution of the United States.

> BY: _/s/ William Emmett Dwyer_
> William Emmett Dwyer
> Attorney for Plaintiffs
> New Jersey Protection and Advocacy, Inc.
> 210 South Broad, 3rd Floor
> Trenton, NJ 08608

DATED: September 29, 2005

### Certification of No Other Action

William Emmett Dwyer certifies as follows:

The within matter is not the subject of any other action pending in any other court and is likewise not the subject of any pending arbitration proceeding or administrative proceeding.

> BY: _/s/ William Emmett Dwyer_
> William Emmett Dwyer
> Attorney for Plaintiffs
> New Jersey Protection and Advocacy, Inc.
> 210 South Broad, 3rd Floor
> Trenton, NJ 08608

DATED: September 29, 2005